UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| JANICE B. ADAMS, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Cause No.: 3:09-CV-468 |
|  | ) |  |
| INDIANA WESLEYAN UNIVERSITY, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**OPINION AND ORDER**

This matter is before the court on the motion to dismiss filed by the defendant, Indiana Wesleyan University ("the University") on February 18, 2010 (docket at 18). On that same date, the University filed a Brief in Support of its Motion to Dismiss (docket at 19) as well as an Index of Exhibits (docket at 20). After moving for and receiving an extension of time in which to do so, plaintiff Janice B. Adams ("Adams") filed a Response in Opposition to Defendant's Motion to Dismiss on April 5, 2010 (docket at 23) and the University filed a reply brief on May 4, 2010 (docket at 24). For the reasons discussed herein, the motion to dismiss is GRANTED.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(1) "requires a court to dismiss an action when it lacks subject matter jurisdiction." *Durst v. Ill. Farmers Ins. Co.,* 2005 WL 2007221, at *1 (N.D. Ill. Aug.16, 2005) (citing *United Phosphorus, Ltd. v. Angus Chem. Co.,* 322 F.3d 942, 945 (7th Cir. 2003)). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *United States v. Tittjung,* 235 F.3d 330, 339 (7th Cir. 2000). If there is no statutory basis for its subject matter jurisdiction, "a district

court, which is a court of limited jurisdiction, should proceed no further than determining whether to dismiss or transfer the case." *Baker v. Kingsley,* 387 F.3d 649, 656 (7th Cir. 2004). In considering a motion to dismiss for lack of subject matter jurisdiction, a court "must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor." *United Transportation Union v. Gateway Western Railway Co.,* 78 F.3d 1208, 1210 (7th Cir. 1996). *See also, Indiana ex rel. Naylor v. Indiana State Teachers Ass'n*, 2010 WL 1737914 (S.D. Ind. April 28, 2010).

## DISCUSSION

Adams filed this lawsuit on October 5, 2009, alleging that the University, her former employer, discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. Complaint, docket at 1. After obtaining leave of court to do so, Adams filed an Amended Complaint on February 10, 2010 (docket at 16) and it is this Amended Complaint that now controls this case. Adams, who worked for the University from 1992 until 2009 as a professor and Chair of the Social Work Department, claims that she "was repeatedly exposed to discriminatory acts and harassed on account of her race by the defendant." Amended Complaint, p. 2. Adams claims that the discrimination she was subjected to was "severe and pervasive" and that as a result she "resigned on June 20, 2009." *Id*. By way of her lawsuit, Adams seeks declaratory and injunctive relief, damages, and attorneys' fees from the University.

In its motion to dismiss, the University contends that this court lacks subject matter jurisdiction over this case and that it should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1). Motion to Dismiss, p. 1. Alternatively, the University seeks dismissal pursuant to Fed.R.Civ.P.

12(c) based on "the ministerial exception and, with respect to several of Adams' Title VII claims, because Adams failed to properly exhaust her administrative remedies." *Id.*[1]

The ministerial exception is an important but very narrow doctrine, and turns on the specific facts of a case. More specifically, its application is dependent on the duties of the employee or former employee who is bringing a lawsuit against a church or other ecclesiastical body. In this case, the University contends that Adams was much more than a teacher and that "the spiritual significance of Adams' position divests this Court of subject matter jurisdiction over her claims under the 'ministerial exception' to federal employment laws." Defendant's Memorandum, p. 1. The University explains that it "is one of the largest evangelical Christian universities in the United States[.]"; that it "operate[s] under the auspices of the Wesleyan Church's governing body, the General Conference[.]"; that "its Board of Trustees . . . is charged with operating the University in accordance with the Church's policies and educational mission[.]"; and that the University is "an 'arm' of the Church's ministry to Christ." *Id.*, p. 2. Adams does not dispute that Indiana Wesleyan is an institution of higher learning operated by the Wesleyan Church.

The University argues that Adams' duties as a professor were much different than those of a professor at a secular institution. The University claims that "[t]he central mission of the Church's educational ministry is to redeem all persons by revealing God as 'the source and center of all truth[.]'"; that "[t]he Church's educational institutions use the Bible to 'relate

---

[1] Because the court finds that this case must be dismissed for lack of subject matter jurisdiction, and because the ministerial exception applies with equal force to all of Adams' claims–whether they are brought under Title VII or § 1981–the University's alternate theory that some of Adams' claims are barred due to her failure to exhaust administrative remedies need not be addressed in this Opinion and Order.

3

learning to God and His plan for the universe.'" *Id*. (quoting Defendant's Exhibit B, docket at 20-1, Standards of the Wesleyan Church for Educational Institutions, § GB-1112). In keeping with that mission, the University states, its "faculty members are, as a matter of necessity and belief, stewards of the Wesleyan faith . . ." and they are required to "'affirm their adherence to the doctrine of the entire sanctification and other doctrines of The Wesleyan Church.'" *Id*., p. 3 (*Id*. at GB-1342). Applying this doctrine directly to Adams, the University contends that "Adams' principal responsibility was to apply Wesleyan doctrine and integrate the truths of the Bible with the Social Work curriculum." *Id*., p. 5. The University dedicates many pages of its memorandum in support of its motion to dismiss discussing the details of Adams' employment history in an attempt to demonstrate that her job duties were rooted firmly in Church doctrine, meaning in turn that her claims fall within the parameters of the ministerial exception to this court's subject matter jurisdiction. *Id*., generally. For example, the University claims that at times during the 1990s, Dr. Glenn Martin, "who was Chair of the University's Division of Social sciences and Adams' supervisor . . ." counseled her on ways she could incorporate Church doctrine into her classroom activities and, at that time, praised her efforts to do just that. *Id*., pp. 6-7. This involved Adams "'frequently us[ing] scriptural principles to reinforce or to illustrate an idea.'" *Id*., p. 7 (quoting Defendant's Exhibit G).

In 2001, Adams was promoted from Assistant to Associate professor (effective at the beginning of the 2002-2003 academic year). *Id*., p. 8. Prior to that, in a 1999 employment evaluation, Dr. Martin noted that Adams was "'a spiritual leader in the classroom and in the local community and is very active in the church.'" *Id*. (quoting Defendant's Exhibit J, Faculty Evaluation). The University also points out that many of Adams' student, in evaluations they

4

filled out concerning their classroom experiences with Adams, stated that she had "amazing passion for the topics discussed and also for Christ . . ."; that Adams' in-class "devotions were uplifting . . ."; and that Adams was "very influential in my spiritual life." *Id*., pp. 8-9 (citations to record omitted). The University claims that "[t]he Social Work Program that Adams directed has only two stated goals. The first is to prepare students to complete entry-level social work. . . . The second is to "'provide opportunities for the integration of Christian principles within the context of professional social work and ethics.'" *Id*., p. 9 (citations to record omitted). All of this factual presentation and argument is the University's attempt to demonstrate that Adams' employment was ministerial in nature to such an extent that the ministerial exception precludes her from pursuing this employment discrimination case in federal court.

The University contends that shortly after her promotion to Associate Professor, "Adams began to clash with Dr. Betty Fratzke, who remained Adams' supervisor, and other members of the Social Work Department . . . over a variety of issues related to the Department's management." *Id*., p. 10. These alleged issues included, according to the University, Adams' insistence on asking prospective students during admissions interviews "whether they had ever been involved in a romantic relationship with an African-American." *Id*. (Adams is African-American.) The University contends that "questions of such an intimate nature were contrary to the University's Christian mission." *Id*. Another issue arose regarding a Department secretary named Michelle Gerig. According to the University, "Adams shared Gerig as a secretary with several other faculty members." The University states as follows:

> Throughout the first half of 2009, Adams complained to Dr. Fratzke that, among other things, Gerig was not completing the work Adams assigned to her in a timely manner, was following other Department members' instructions, but not Adams' instructions, and was not effectively managing her time. The situation

5

>between Adams and Gerig became so intense that in spring 2009 Adams told Dr. Fratzke that she was going to resign if Gerig was not removed as her secretary.

*Id.*, p. 11. The University states that Dr. Fratzke arranged a meeting with Adams and "several other Department members to resolve the situation. . . . Dr. Fratzke arranged for this meeting specifically to fulfill the directive of Matthew 18:15, upon which the University's conflict resolution practices are based, to reconcile conflict by meeting with the disputing parties." *Id*. The University states that "Dr. Fratzke explicitly stated that she was directing Adams and the others to engage in this [reconciliation] conduct based on Christian principles." *Id*. Several days after the meeting, according to the University, Adams challenged Dr. Fratzke by writing a responsive e-mail "in which she rejected Dr. Fratzke's assertion that her recommended course of action was justified by the scriptures" and taking "aim at Dr. Fratzke's interpretation of the Book of Matthew . . ." *Id.*, p. 12. Then, "[o]n June 24, 2009, just over a week after sending this e-mail, Adams resigned her position as Director of the Social Work Program, citing a 'lack of Administrative and staff support.' . . . Six days later, on June 30, 2009, she resigned her position as Associate Professor and ended her employment with the University." *Id*. (citations to the record omitted).

Because of all this, the University contends that "Adams' Amended Complaint should be dismissed because the Court does not have subject matter jurisdiction over her claims. . . . Adams worked for the University in a ministerial capacity, and the ministerial exception to federal employment claims created by the First Amendment operates as a jurisdictional bar to this action." *Id.*, pp. 13-14. The University summarizes its argument as follows:

>Courts derived the "ministerial exception," which bars ministerial employees from asserting claims against religious institutions under federal employment

> discrimination laws" from [the establishment clause and the free-exercise clause
> of the First Amendment]. *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036,
> 1039-40 (7th Cir. 2006) . . . The ministerial exception is "founded upon the
> principle that 'perpetuation of a church's existence may depend upon those whom
> it selects to preach its values, teach its message, and interpret its doctrines both to
> its own membership and to the world at large." *Alicea-Hernandez v. Catholic
> Bishop of Chicago*, 320 F.3d 698, 704 (7th Cir. 2003) (quoting *Rayburn v. Gen'l
> Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1168 (4th Cir. 1985)). . . .
> Because court review of a religious institution's employment decisions respecting
> its ministers is an "inherently coercive" intrusion into a matter of religious
> governance, the ministerial exception operates as a complete bar to employment
> claims based on federal law. *Tomic*, 442 F.3d at 1039.

*Id.*, pp. 14-15.

The University's statement of the law concerning the ministerial exception is correct. The issue in this case is whether Adams, in her capacity as a department head and professor, fits into that exception. Obviously, the University argues that she does. Adams, however, disagrees.[2] In her response brief, Adams states that "the designated material shows that Adams' position was not functionally equivalent to a minister and adjudicating her claims would not require the court to engage in an analysis of church doctrine, as prohibited by the 'Ministerial Exception" to anti-discrimination laws. Moreover, Adams' Amended Complaint cites [42 U.S.C.] Section 1981 as a basis for jurisdiction. This allows her to allege claims outside of the EEOC Charge of Discrimination." Plaintiff's Response, p. 1. While Adams does not contest the fact that Indiana Wesleyan is an arm of the Church and is governed according to Church doctrine, she argues that the "social work program is designed to integrate students' pre-existing

---

[2] The fact that Adams was a professor, as opposed to an ordained minister, is not dispositive. As the University points out, "[b]ecause the analysis focuses on the duties performed, the ministerial exception applies even if the employee is not ordained or otherwise labeled a 'minister.'" *Id.*, p. 15 (citing *Alicea-Hernandez*, 320 F.3d at 704, n. 4).

7

faiths into 'one's ability to be of service to fellow human beings.'" *Id.*, p. 2 (citing Defendant's Exhibit O, Indiana Wesleyan Social Work Student Handbook, p. 3). She also points out that the program "is not designed to 'spread the faith' but has eight identified secular purposes:

a. Applying knowledge and skills of *generalist* social work practice;

b. Evaluating the practice of social work as it exists;

c. Professional development and growth;

d. Applying critical thinking skills within a *diverse* population;

e. Understanding the past and present of social work;

f. Understanding the conditions and strategies to advance socio-economic justice; [and]

g. Understanding how certain variables effect interpretation among individuals and social systems." *Id.*, p. 2 (quoting Defendant's Exhibit O).[3] Adams argues that the University is attempting to mischaracterize her employment position as ministerial in nature, thereby fitting it into the ministerial exception. *Id.*, generally. In response, she argues that "the University has many distinct disciplines, most of which are not directly related to religion. Adams' position as a professor of social work did not require her to 'spread the faith.' Instead, she was simply integrating faith into a curriculum containing students who already believed the faith. The program had stated secular purposes. Moreover, [Adams] was allowed to discuss competing truths as well as whether church doctrine was correct." *Id.*, pp. 3-4. Finally, Adams contends that the cases cited by the University in support of its argument that the ministerial exception

---

[3] It is true that the Indiana Wesleyan Social Work Student Handbook contains this listing. However, Adams neglects to point out that the Handbook also clearly states that one of the objectives of the University's Social Work Program is "[t]o provide opportunities for the integration of Christian principles within the context of professional social work values and ethics." This is significant, as will become clearer later in this Opinion.

bars her lawsuit are not on point. *Id*., p. 4. For these reasons, Adams argues that her suit should not be dismissed.[4]

The Seventh Circuit Court of Appeals provided a thorough discussion of the ministerial exception in the *Tomic* case, cited by both parties in this case. In *Tomic*, the court of appeals explained as follows:

> A suit to remove a priest on the ground that he is a heretic, or to reinstate a parishioner who has been excommunicated, thus has never been justiciable in the federal courts. E.g., *Serbian Eastern Orthodox Diocese v. Milivojevich, supra,* 426 U.S. at 698, 96 S.Ct. 2372; *Bouldin v. Alexander,* 82 U.S. (15 Wall.) 131, 139-40, 21 L.Ed. 69 (1872); cf. *Montano v. Hedgepeth,* 120 F.3d 844, 850-51 (8th Cir. 1997). Even if the suit does not involve an issue of religious doctrine, but concerns merely the governance structure of the church, the courts will not assume jurisdiction if doing so would interfere with the church's management. *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952); *Young v. Northern Illinois Conference of United Methodist Church,* 21 F.3d 184, 187 (7th Cir. 1994); *Combs v. Central Texas Annual Conference of United Methodist Church,* 173 F.3d 343, 350 (5th Cir. 1999); *EEOC v. Catholic University of America,* 83 F.3d 455, 462-63 (D.C.Cir. 1996). These cases "affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine'." *Id.* at 462, citing *Kedroff;* see also *Gellington v. Christian Methodist Episcopal Church, Inc.,* 203 F.3d 1299, 1304 (11th Cir. 2000). Also pertinent is *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). The issue in that case was whether the National Labor Relations Act applied to lay teachers in Catholic schools. The Court held not, because "the resolution of [unfair labor] charges by the [National Labor Relations Board], in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of

---

[4] In its reply brief, the University essentially restates the arguments the arguments presented in its supporting memorandum. Defendant's Reply, generally. The University does, however, add a few arguments, including a claim that "teaching is spiritually significant to Wesleyans and that teachers in schools run by the Church "participate in [its] ministry and extol God's design [and therefore] exercise a divinely authorized stewardship over the natural world." *Id*., p. 4. The University also states that "[i]n revealing God's truth, Adams and other faculty members must understand secular topics and relate them to Wesleyan doctrine. But the fact that Adams had to instruct her students on secular topics does not undermine the spiritual significance of her position." *Id*.

9

> inquiry leading to findings and conclusions." *Id.* at 502, 99 S.Ct. 1313.
>
>> Thus "the First Amendment concerns [with assuming jurisdiction in ecclesiastical cases] are two-fold. The first concern is that secular authorities would be involved in evaluating or interpreting religious doctrine. The second quite independent concern is that in investigating employment discrimination claims by ministers against their church, secular authorities would necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged discrimination were purely nondoctrinal." *Combs v. Central Texas Annual Conference of United Methodist Church, supra,* 173 F.3d at 350 (citations omitted). This second aspect of the internal-affairs doctrine is called the "ministerial exception" to the exercise of federal jurisdiction. E.g., *Alicea-Hernandez v. Catholic Bishop of Chicago,* 320 F.3d 698, 702-03 (7th Cir. 2003).
>>
>> Both aspects govern decision even when–in fact most commonly when–the complaint is not based on and does not refer to religious doctrine or church management (as in most Title VII and other employment-discrimination suits) but it is apparent that a controversy over either may erupt in the course of adjudication. E.g., *id.*; *EEOC v. Roman Catholic Diocese of Raleigh,* 213 F.3d 795, 801 (4th Cir. 2000).

*Tomic v. Catholic Diocese of Peoria*, 442 F.3d at 1038-1039. In light of this discussion, the issues in the present case are whether Adams' job as a Department head and professor truly was ministerial in nature and whether the exercise of jurisdiction over her claims by this court would "intrude into church governance." The University contends that the nature of Adams' teaching duties, and the very fact of her employment in a church operated school, bring her claims within the parameters of the ministerial exception to this court's subject-matter jurisdiction, while she contends that the University is simply "spinning" the facts for the purpose of pigeonholing her into the exception. This court must also be mindful of the fact that this matter is before it on a motion to dismiss. As stated above, when ruling on a motion to dismiss for lack of subject matter jurisdiction, the court "must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor." *United Transportation Union v. Gateway Western Railway Co.,* 78 F.3d 1208, 1210 (7th Cir. 1996). In

10

this case, Adams has asserted claims against the University pursuant to Title VII and § 1981. Docket at 16. Her Amended Complaint reveals that her allegations of discriminatory treatment are not rooted in the doctrine of the Wesleyan Church. Instead, she has set forth claims of discriminatory treatment on the basis of her race, notwithstanding any church doctrine, philosophy or system of governance. *Id*. But this does not save her case. The applicable case law discussing and analyzing the ministerial exception to federal court jurisdiction makes this clear.

In *Alicea-Hernandez*, the plaintiff brought a Title VII action against her employer, the Catholic Bishop of Chicago. Plaintiff was a press secretary whose duties included dissemination of the Church's message. The Seventh Circuit held that the ministerial exception applied to bar plaintiff's claims. The court wrote that "the rationale for the ministerial exception is founded upon the principle that 'perpetuation of a church's existence may depend upon whom it selects to preach its values, *teach its message*, and interpret its doctrines *both to its own membership* and to the world at large.'" *Alicea-Hernandez*, 320 F.3d at 704 (italics added). In that case, plaintiff argued that her claims of gender and national origin discrimination were wholly unrelated to church doctrine or to her job duties and, therefore, the exception should not apply. The court rejected this argument, found that the ministerial exception applied, and offered the following detailed analysis of the exception:

> We turn next to the argument that Alicea-Hernandez's particular position bars the federal courts from deciding her Title VII claims. Here the Church has the stronger argument. As the Fifth Circuit first articulated in *McClure v. The Salvation Army,* 460 F.2d 553, 560 (5th Cir. 1972), "application of the provisions of Title VII to the employment relationship existing between ... a church and its minister would result in an encroachment by the state into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause

11

of the First Amendment." This rule, often referred to as "the ministerial exception," was further developed by the Fourth Circuit in *Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164 (4th Cir. 1985), and adopted by this circuit in *Young v. The Northern Illinois Conference of United Methodist Church,* 21 F.3d 184 (7th Cir. 1994). The court in *Rayburn,* recognizing tensions between freedom of religion on the one hand and the attempt to eradicate discrimination on the other, concluded that in the context of Title VII claims brought against a church by its ministers the "balance weighs in favor of free exercise of religion." 772 F.2d at 1168. The court explained that the "right to choose ministers without government restriction underlies the well-being of religious community." *Id.* at 1167. While this ruling may seem in tension with Title VII, we concur with the Fourth Circuit when it stated: "While an unfettered church choice may create minimal infidelity to the objectives of Title VII, it provides maximum protection of the First Amendment right to free exercise of religious beliefs." *Id.* at 1169.

In determining whether an employee is considered a minister for the purposes of applying this exception, we do not look to ordination but instead to the function of the position. *Young,* 21 F.3d at 186; *see also EEOC v. Roman Catholic Diocese,* 213 F.3d 795, 801 (4th Cir. 2000) ("Our inquiry thus focuses on 'the function of the position' at issue and not on categorical notions of who is or is not a 'minister.' "). The question for us to answer therefore is whether Alicea-Hernandez's position as Hispanic Communications Manager can functionally be classified as ministerial. Alicea-Hernandez suggests that we also need to look to the nature of her claims and whether the discrimination in question was exclusively secular. Here she is mistaken. The "ministerial exception" applies without regard to the type of claims being brought. This was explained by the Fourth Circuit in *EEOC v. Roman Catholic Diocese:*

> [T]he ministerial exception to Title VII is robust where it applies.... The exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision. The church need not, for example, proffer any religious justification for its decision, for the Free Exercise Clause "protects the act of a decision rather than a motivation behind it."

213 F.3d at 802 (quoting *Rayburn,* 772 F.2d at 1169). To rule otherwise would enmesh the court in endless inquiries as to whether each discriminatory act was based in Church doctrine or simply secular animus. The Fifth Circuit has provided the following rationale for this rule:

> [A]n investigation and review of such matters of church administration and government as a minister's salary, his place of assignment and his duty, which involve a person at the heart of any religious organization,

12

> could only produce by its coercive effect the very opposite of that separation of church and State contemplated by the First Amendment.

*McClure,* 460 F.2d at 560.

> It is therefore not our role to determine whether the Church had a secular or religious reason for the alleged mistreatment of Alicea-Hernandez. The only question is that of the appropriate characterization of her position.

*Id*. at 702-703. The court determined that Alicea-Hernandez's duties "included composing media releases and correspondence as well as developing a working relationship with various constituencies of the Hispanic community and composing articles to be published in the Church media. . . . The role of the press secretary is critical in message dissemination, a church's message, of course, is of singular importance." *Id*. at 703-704. Based on these facts, the court held that the ministerial exception applied.

In the present case, Adams argues that as a professor she was not charged with the responsibility of disseminating the message or doctrine of the Wesleyan Church. Instead, she claims that her "job responsibilities were closer to those of a lay employee. . . . Adams took her students as she found them. She worked [their] beliefs into her curriculum, yet she did not teach the faith, nor was she prevented from discussing the nature and correctness of certain truths." Plaintiff's Memorandum, p. 5. Adams also argues that "adjudicating Adams' claims does not risk excessive entanglement. This case involves Adams' allegation that she was forced to resign as a result of racial harassment." *Id*. In short, Adams contends that she was not responsible for "spreading the word" of the Wesleyan Church and that her claims are secular and in no way related to any principles or doctrine of the Wesleyan Church.

Adams' argument ignores the fact that the ministerial exception is "robust where it

applies" and "precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision." *Alicea-Hernandez*, 320 F.3d at 703. It is not the court's duty "to determine whether the Church had a secular or religious reason for the alleged mistreatment of [the plaintiff]. The only question is that of the appropriate characterization of her position." *Id*. In the present case, while Adams may very well have been free to present and discuss secular topics and issues in her classroom, it is also true that she was charged with incorporating the doctrine of the Wesleyan Church into her curriculum. Eventually, Adams clashed with certain members of the University administration. Meetings were held to address the issues between the parties and resolve them. In the end, Adams concluded that she could no longer bear to work at the University and resigned her position. The fact that she claims she was forced to resign as a result of pervasive racial harassment as opposed to any sort of doctrinal or theological dispute does not take this case outside the parameters of the ministerial exception.

The ministerial exception to federal court jurisdiction is a crucially important legal doctrine, designed to prevent the federal courts from becoming entangled in the internal affairs of a church. The ministerial exception serves a vitally important purpose by protecting a church's ability to establish its own doctrinal foundation, to communicate its theology to its members and the public at large, and to manage its internal affairs, all free from any intervention from the federal courts. Furthermore, case law makes it clear that the ministerial exception can, and often does, apply to teachers who instruct students in church-run and operated schools. As the University points out, "courts in both the Seventh Circuit and elsewhere have found that the ministerial exception applies where teachers, like Adams, are required to integrate church doctrine into their teaching." Defendant's Reply, p. 7 (citing *Stately v. Indian Cmty. Sch. of*

*Milwaukee, Inc.*, 351 F.Supp.2d 858, 870 (E.D. Wisc. 2004)) (applying ministerial exception where school required teachers to incorporate religion into classes). *See also, Clapper v. Chesapeake Conference of Seventh-Day Adventists*, 1998 WL 904528 (4th Cir. Dec. 29, 1998) (applying ministerial exception to bar former church elementary teacher from bringing claims of discrimination against church where his duties included incorporating church doctrine into his classroom activities and acting as a spiritual mentor to students).[5] This court concludes that the nature and character of Adams' duties as a department head and professor at Indiana Wesleyan University were ministerial in nature so as to invoke the ministerial exception to this court's subject matter jurisdiction.

## CONCLUSION

---

[5] The ministerial exception to federal court subject matter jurisdiction also has been extended to other, more seemingly peripheral employees of religious based institutions. *See, e.g., Nat'l Labor Relations Board v. Catholic Bishop of Chicago*, 440 U.S. 490, 501 (1979) (NLRB could not exercise jurisdiction over non-ordained teachers charged with spreading the church's message to students in church-run schools); *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1040 (7th Cir. 2006) (non-ordained musical director performed "ministerial function" by selecting what music to play during mass); *Schleicher v. The Salvation Army*, 518 F.3d 472 (7th Cir. 2008) (employees who helped run adult rehabilitation center, led prayer and worship singing, and sold goods in thrift shop were considered ministers since their duties had a "spiritual dimension" under the Salvation Army's religious tenets).

For the reasons discussed above, the motion to dismiss filed by defendant, Indiana Wesleyan University is GRANTED.

Date: July 15, 2010.

                                    /s/   William C. Lee
                                    William C. Lee, Judge
                                    United States District Court
                                    Northern District of Indiana